IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
v.                             )         No. 2:18-CR-17-RLJ-DHI-37
                               )
LAWSHAWN JOHNSON,              )
                               )
                Defendant.     )


## REPORT AND RECOMMENDATION

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the District Court's Order of Referral [Doc. 1098], to address Defendant's Second Motion to Suppress Confession [Doc. 1081], filed on August 27, 2019. Defendant previously filed his first Motion to Suppress Confession [Doc. 981] on April 22, 2019. The Government filed a response in opposition [Doc. 1190] to both Motions to Suppress on September 12, 2019.

An evidentiary hearing was held on Defendant's Motions to Suppress on September 23, 2019. [Doc. 1249]. Assistant United States J. Gregory Bowman appeared on behalf of the Government. Attorney Jerry J. Fabus, Jr., represented Defendant Johnson, who was also present. After hearing the arguments of counsel, the Court took the motions under advisement.

Accordingly, after reviewing the parties' briefs and arguments, the evidence and exhibits presented at the hearing, and the relevant legal authorities, the Court recommends that both of Defendant's Motions to Suppress be denied.

## I. POSITIONS OF THE PARTIES

Defendant Johnson is charged [Doc. 3] with conspiring to distribute fifty (50) grams or more of methamphetamine, a Schedule II controlled substance (Count 1), knowingly possessing a firearm in furtherance of a drug trafficking offense (Count 23), and money laundering (Count 30).

Defendant first seeks [Doc. 981] to suppress his January 2, 2017 confession to Agent John Wilson ("Agent Wilson") and Special Agent Scott Payne ("SA Payne"), arguing that the Government will refuse to present Detective Joshua Goins ("Detective Goins") as a witness at trial, and thus the Government would not be able to show probable cause to perform the traffic stop of Defendant and the search of the vehicle he was driving. Therefore, Defendant asserts that his subsequent confession to Investigator Wilson and Special Agent Payne should be suppressed as fruit of the poisonous tree.

Defendant also seeks [Doc. 1081] to suppress his January 2, 2017 confession, claiming that he was originally interrogated by Detective Goins after he requested to speak to his attorney multiple times and stated his wish to remain silent. However, Defendant asserts that he eventually confessed to owning the seized methamphetamine and firearm in the vehicle after being interrogated by Detective Goins, and then agreed to speak with Agent Wilson and SA Payne. At this point, Defendant admits that he was read his *Miranda* rights, signed a written waiver of his right to remain silent, and eventually provided a very detailed confession to Agent Wilson and SA Payne. However, Defendant claims that the warning of his rights under *Miranda* occurred only after he was already interrogated by Detective Goins, had requested to speak with an attorney, and eventually confessed. Therefore, Defendant seeks to have his confession on January 2, 2017 suppressed from the evidence at trial.

2

The Government first responds [Doc. 1190] that it intends to call Detective Goins as a witness at trial, and the Court notes that the Government called Detective Goins as a witness at the evidentiary hearing. Further, the Government maintains that while Defendant was in custody, he was not interrogated prior to the arrival of Agent Wilson and SA Payne, as demonstrated by the written waiver of his rights. The Government asserts that Detective Goins did not question or interview Defendant prior to his interrogation by Agent Wilson and SA Payne. Therefore, the Government states that the only statement that it has to offer against Defendant at trial is his confession given to Agent Wilson and SA Payne after he waived his right to remain silent and to speak with an attorney.

## II.    SUMMARY OF TESTIMONY

At the September 23 hearing, the Government presented the testimony of Campbell County Sheriff's Office Detective Joshua Goins, and Federal Bureau of Investigation Special Agent Scott Payne.[1] Defendant testified on his own behalf. The Government also introduced as Exhibit 1 an Investigative Report from the Eighth Judicial District prepared by Detective Goins regarding his investigation of Defendant on January 2, 2017; the *Miranda* Waiver signed by Defendant as Exhibit 2; and a letter from Defendant to the United States Attorney's Office as Exhibit 3. The Court summarizes the witness's testimony and introduced exhibits as follows.

The Government first presented the testimony of Detective Goins, who has been a detective with the Campbell County Sheriff's Department for approximately two weeks, and previously was the acting director of the Eighth Judicial District Drug Task Force, including on January 2, 2017. [Tr. 5–6]. Detective Goins testified that he received information from a confidential source that Defendant was in possession of a safe containing narcotics and possibly a firearm at a residence

---

[1] The Transcript [Doc. 1270] of the September 23, 2019 evidentiary hearing was filed on October 3, 2019.

in LaFollette, Tennessee. [Tr. 6]. While Detective Goins was unable to recall which confidential source contacted him, he stated that it was someone he had likely dealt with on other cases. [Tr. 6–7]. He further testified that he was not familiar with Defendant at this point. [*Id.*]. Detective Goins then contacted Agent John Wilson with the Seventh Crime Task Force, who advised him that there was a parole violation for Defendant's arrest, and he pulled Defendant's criminal history, including a photograph, from the Tennessee Criminal Justice Report. [Tr. 7–8].

Detective Goins testified that he conducted surveillance on the "Long residence" where Defendant was reportedly located. [Tr. 8]. Detective Goins was already familiar with the location from his interactions with the Long family. [*Id.*]. Additionally, Detective Goins stated that the confidential source indicated that Defendant would be driving a white Lexus, which was his attorney's car. [*Id.*]. Detective Goins began surveilling the Long residence, saw a white Lexus parked at the location, and after a short period of time, saw an individual get into the white Lexus. [Tr. 9]. At this point, Detective Goins testified that the white Lexus "did not stop for a stop sign at the bottom of the drive," and he followed the vehicle to "17th and West Avenue," where it again rolled through the stop sign. [*Id.*]. Detective Goins continued to maintain surveillance until marked units could conduct a traffic stop on the vehicle. [*Id.*].

A traffic stop was then conducted on the vehicle. [Tr. 10]. Detective Goins testified that prior to the stop, he was unable to tell who was driving the vehicle, but as he approached the vehicle after the stop, he observed that Defendant was the driver. [*Id.*]. Detective Goins indicated to Defendant that he had been stopped for performing a rolling stop at the stop sign, and he, along with local law enforcement, ordered Defendant to go to the rear of his vehicle. [Tr. 10–11]. Defendant then complied and exited the vehicle. [Tr. 11]. Detective Goins testified that after learning that Defendant had a parole violation, he contacted his parole officer, and was instructed

4

by the parole officer to have Defendant searched when stopped due to his parole contract. [Tr. 11–12].

Detective Goins first sought to obtain Defendant's consent to search the vehicle, despite the fact that there was a search condition in Defendant's parole contract, and Defendant refused to consent to the search. [Tr. 12]. Detective Goins and local law enforcement then searched the vehicle, and found a locked, black safe inside of the vehicle. [*Id.*]. Detective Goins stated that he asked Defendant if he could try the keys in the ignition to open the safe, and Defendant responded "Yes, if you can find it." [*Id.*]. Detective Goins then opened the safe by using a key on the vehicle key chain. [Tr. 13]. Detective Goins testified that law enforcement found a firearm, a Social Security card in Defendant's name, a substance believed to be methamphetamine, and other narcotics inside of the safe. [*Id.*].

At this time, Defendant was at the rear of the vehicle, and had already been placed under arrest due to the parole violation warrant. [*Id.*]. Following a search of Defendant pursuant to the arrest, law enforcement found approximately $3,000 in a pair of shorts under Defendant's pants. [Tr. 15]. When asked about Defendant's claim that he at one point conducted an interrogation, Detective Goins stated:

> At any point in time I – if I find something, I would document it in my report, and I never at any one point interviewed Mr. Johnson other than on the side of the roadway while we were conducting our investigation. He requested to talk to somebody – how he put it to me was above my pay grade, or above my head, talking about the FBI. From there, I contacted Agent Wilson from the CTF in Henderson County, contacted the FBI to speak to him.

[Tr. 14]. Detective Goins stated that he prepared a report of his contact with Defendant on January 2, 2017, and the report does not indicate that he interrogated Defendant. [*Id.*]. Next, Defendant was transported to the Campbell County Sheriff's Office to be held due to his arrest and parole

5

violation. [Tr. 16]. Detective Goins testified that he did not transport Defendant to the Campbell County Sheriff's Office, as he was driving an unmarked vehicle. [Tr. 18].

Detective Goins stated that Agent Wilson and SA Payne came to speak with Defendant, but that he did not take part in any interrogation, debrief, or questioning of Defendant after he was taken to the Campbell County Sheriff's Office. [Tr. 16]. The only statements by Defendant that Detective Goins noted in his report was Defendant's comment, "If you can find it," referring to the keys. [Tr. 17]. Further, Detective Goins stated that the stop took place in the early evening, and estimated that it took approximately an hour and fifteen minutes from the time when Defendant's vehicle was stopped until he arrived at the Campbell County Sheriff's Office. [*Id.*]. Because Detective Goins was in an unmarked vehicle, he did not transport Defendant to the Campbell County Sheriff's Office. [*Id.* at 18].

On cross-examination, Detective Goins testified that he resigned from his position with the Eighth Judicial Task Force after dating an employee, while he was a supervisor, and issues arose after the break-up. [Tr. 20]. Detective Goins stated that the employee made a complaint to the district attorney, and he subsequently decided to resign in September of 2018. [*Id.*]. However, Detective Goins testified that it was not against department policy for him to be in such a relationship, and that there were not any complaints against him that were drug-related. [*Id.*]. Detective Goins stated that he was rehired by the Campbell County Sheriff's Office two weeks prior to the hearing as a detective sergeant in the narcotics unit. [Tr. 20–22].

In response to questioning that the Lexus was a push-start vehicle, and did not require keys in an ignition to start, Detective Goins stated that it had been two years ago, but it was his recollection that keys were in the ignition. [Tr. 22]. Further, when asked why his case file notes reflect that Defendant gave consent to search the car, Detective Goins testified that he was unaware

6

of that. [*Id.*]. After being questioned regarding Defendant's statement that he was interviewed at around 3:00 or 3:30 in the afternoon, Detective Goins stated that in his recollection, Defendant was arrested in the evening. [Tr. 24]. Lastly, Detective Goins testified that he was unaware of any complaints made by other defendants regarding missing drugs or money from the crime unit. [*Id.*].

On re-direct examination, the Government introduced into evidence the Investigative Report as Exhibit 1. [Tr. 26]. Detective Goins testified that the report stated that Defendant's parole officer indicated to him that under his parole agreement, Defendant was subject to a search of his person and vehicle. [Tr. 26]. Detective Goins also stated that the report indicates that after finding the safe, he asked Defendant whether keys on the key ring would open the safe, but does not indicate that he asked Defendant for consent. [Tr. 26–27]. After reviewing the report, Detective Goins testified that the report noted that the time of the offense was 12:45 p.m., that this was the correct time, and earlier he had forgotten the time of day that he pulled over Defendant's vehicle. [Tr. 27]. Lastly, Detective Goins testified that the Campbell County Sheriff's Office was aware of the conduct leading to his earlier resignation from the Eighth Judicial Task Force, and no formal action or adverse personnel actions were taken against him. [Tr. 28].

The Government then called SA Payne, who stated that he has been an FBI agent for the past twenty years, including working undercover investigations, and investigating domestic terrorism violations for the past three years. [Tr. 30]. SA Payne stated that he was involved in the investigation of a methamphetamine trafficking case which involved Defendant and 43 other codefendants, and he closely worked with Seventh Drug Task Force Agent John Wilson. [Tr. 31]. SA Payne testified that on January 2, 2017, he was contacted by Agent Wilson and told that Defendant "had been stopped" in Campbell County. [*Id.*]. Agent Wilson testified that Defendant

7

was of interest to his investigation into methamphetamine trafficking, as they had multiple defendants who were white supremacists, and had begun "leaning o[n] a lot of drug distributors" and "already had probably like three sources who had already reported on [Defendant]." [Tr. 32]. SA Payne stated that he and Agent Wilson then drove after lunch-time to the Campbell County Sheriff's Office. [Tr. 33].

After arriving at the Campbell County Sheriff's Office, Agent Wilson and SA Payne went to an adjacent building where the detective offices were located, and Defendant was not present at this time. [*Id.*]. Agent Wilson and SA Payne were placed in the one of the detective's offices, and Defendant was then brought over at this time. [Tr. 34]. SA Payne testified that he and Agent Wilson introduced themselves to Defendant and noted their titles and agencies, Defendant was read his *Miranda* rights, and Defendant then signed a waiver of those rights. [Tr. 34–35]. Defendant's signed waiver of his *Miranda* rights was then introduced as a stipulated exhibit. [Tr. 35]. SA Payne testified that either he or Agent Wilson read Defendant's rights to him out loud, Defendant acknowledged that he understood his rights, agreed to waive his rights, and then signed the waiver. [Tr. 35–36]. SA Payne and Agent Wilson then each signed the waiver as witnesses, indicating that they observed Defendant's signature. [Tr. 36]. SA Payne testified that he estimated that he met with Defendant for an hour based on the length of the notes that Agent Wilson took during the interview. [Tr. 37]. Further, SA Payne testified that at no point in the interview did Defendant ask to speak to a lawyer, ask that the interview cease, or in any other way revoke his waiver of his rights. [*Id.*]. Lastly, SA Payne stated that Defendant was unnamed in the report to protect his identity in case he was later used as a source of information. [Tr. 38].

Defendant then testified on his own behalf, and stated that he was driving his attorney's 2015 Lexus IS250 on January 2, 2017. [Tr. 40–41]. Defendant stated that he did stop at the stop

sign, despite being told by Detective Goins that his failure to stop was the reason for his vehicle being pulled over. [Tr. 40]. Further, Defendant testified that after he pulled the vehicle over, law enforcement told him to "throw the keys out the window," to which he responded that he didn't have any keys. [Tr. 41]. After an officer responded that the vehicle was a "push car" Defendant was instructed to shut off the vehicle and step out. [*Id.*]. Defendant testified that he complied and then was told to step to the back of the vehicle. [*Id.*]. Defendant testified that an officer started asking him what he did for a living, how he afforded the vehicle, and kept calling him "Mr. Bush." [Tr. 41–42]. Defendant stated that Mr. Bush was his previous attorney for a pending charge in Knox County state court, and at the time of his arrest, he was on his way to turn himself in for a probation violation. [Tr. 42].

Defendant stated that he informed Detective Goins that he had an attorney, and requested several times to speak with his attorney, however Detective Goins told him no. [*Id.*]. Defendant stated that Detective Goins searched the vehicle despite him saying no "three or four times." [Tr. 43]. Further, Defendant testified that a safe was found under the passenger seat, that he did not have the key for the safe, and that he did not know where the key came from to open the safe. [*Id.*]. Defendant then stated that after he was arrested, Joshua Carroll transported him to the Campbell County Sheriff's Office. [Tr. 44]. Defendant testified that at this time, he asked to call his attorney and have him present before he was interviewed. [*Id.*]. Defendant stated that he arrived at the Campbell County Sheriff's Office before noon, he sat there until around two when he was taken to the "CIP unit, to Joshua Carroll's office." [*Id.*]. Defendant testified that he was interviewed by Detective Goins in Joshua Carroll's office, which was the same office that he was later interviewed in by two agents. [Tr. 45].

9

Defendant stated that during this first interview, Detective Goins told him that "because it was the parole violation and the pending charge with the meth and the gun, that I might as well, you know, go ahead and cooperate." [*Id.*]. Defendant testified that he then "told them almost everything, but not everything." [*Id.*]. Further, Defendant testified that he asked to speak to Mr. Bush, his attorney, "before I ever started talking to them, and he told me no." [*Id.*]. Defendant stated that the first interview with Detective Goins occurred approximately forty-five minutes to an hour before his second interview with SA Payne and Agent Wilson. [Tr. 46]. Defendant acknowledged that during his interview with SA Payne and Agent Wilson, he signed the *Miranda* waiver and proceeded to give a confession. [*Id.*].

On cross-examination, Defendant stated that he was driving his attorney's vehicle because Mr. Bush was his roommate, Mr. Bush had Defendant's car, and Defendant was "up in Campbell County selling Mr. Long a '99 Chevy Blazer Vortec." [Tr. 47]. Defendant explained that he had concluded his business with Mr. Long and was on his way to his bondsman to turn himself in on a parole violation when he was pulled over by Detective Goins. [*Id.*]. Defendant testified that Mr. Bush knew that he was taking his vehicle to turn himself in for the parole violation, and that Mr. Bush had been staying with him for about a month due to marital problems. [Tr. 47–48]. When asked about the push-button start on the Lexus, Defendant stated that he was carrying a key fob around his neck when he was stopped, that there were no other keys on that chain, and that he didn't have any other keys in his possession. [Tr. 48–49]. Defendant stated that Detective Goins obtained a key to the safe from "Randall Long," the individual whose house Defendant had been parked at earlier that day. [Tr. 49–50].

Defendant testified that he knew that Detective Goins obtained the key from Randall Long because Defendant had purchased the safe from Mr. Long approximately a week before January

2, 2017, and the safe was locked when he bought it. [Tr. 50]. Defendant stated that he paid around $100 for the safe, left it at Mr. Long's house, and went to recover the safe on the day of his arrest. [Tr. 51]. After arriving at Mr. Long's house, Defendant stated that he took his money out of the safe (the $2,578.00 which he claims was found in his pocket), returned the key back to Mr. Long, and placed the safe under the seat in the vehicle. [Tr. 51–52]. Defendant testified that he did not keep a key to the safe, and responded affirmatively when asked whether he did not "keep a key to your own safe so you would have some deniability that that was your drugs and gun in the safe." [Tr. 52]. However, Defendant stated that he kept multiple car titles and his birth certificate in the safe, and that he trusted Mr. Long to hold the safe for him. [Tr. 53].

When asked whether "Randall Long placed the gun and the drugs in the safe," Defendant responded that he had "never been arrested for a drug charge in [his] life, and Randall has." [*Id.*]. Defendant also testified that he told Agent Goins that the drugs and gun were his "because Agent Goins told me with the drugs and the gun in my violation, I might as well plead guilty and tell them what I told them." [*Id.*]. Defendant stated that he denied ownership initially, and Detective Goins kept telling him that he was not going anywhere, and "you're not going to call your lawyer until you tell me." [Tr. 54].

Defendant then testified that on January 2, 2017, while at Mr. Long's house, he witnessed Detective Goins parked at the bottom of the hill, and was suspicious that the vehicle belonged to law enforcement. [*Id.*]. Due to this suspicion, Defendant testified that he called his mother, who then called his brother, "D." [Tr. 55]. The Government then introduced as Exhibit 3 a letter written by Defendant to the U.S. Attorney's Office, in which Defendant indicated that he called his brother, but he testified that he called his mother at this time. [Tr. 56]. Defendant then testified that the "Aryan Nations came to the area," which was comprised of two people in pickup trucks.

[Tr. 57]. Defendant stated that these individuals were there as "security" to "drive [him] out," and that when he goes to Campbell County, the Aryan Nation "send[s] somebody to follow" him. [*Id.*]. Further, Defendant testified that these individuals "were going to shoot Agent Goins and I stopped them." [*Id.*]. Defendant detailed that "he nodded and looked at them, and they pulled off," and that he later told Detective Goins that he needed to "stop playing with [his] life." [Tr. 58].

When asked about his statement that Detective Goins interrogated him after the traffic stop, Defendant testified that he had not seen any summaries of a statement he provided to Detective Goins in discovery, but repeated his contention that he provided an interview where he confessed to Detective Goins that the drugs and the gun in the safe belonged to him. [*Id.*]. Defendant acknowledged that he signed a waiver of his *Miranda* rights when meeting with SA Payne and Agent Wilson, as well as that he told them that the drugs and the gun in the safe belonged to him. [Tr. 59]. However, Defendant stated that he told SA Payne and Agent Wilson that Agent Goins told him that "If you don't tell me that the gun was yours, I'm going to charge our [sic] attorneys that it was in the vehicle." [*Id.*]. Therefore, Defendant testified that he acknowledged ownership "instead of letting [his] attorney take the charge." [*Id.*]. Defendant stated that he met with SA Payne and Agent Wilson from about 3:00 to around 5:30 or 6:00. [Tr. 60].

Additionally, Defendant acknowledged that he talked to SA Payne and Agent Wilson at length about Codefendant Randall Wood, but stated that he did not talk to SA Payne and Agent Wilson about Codefendant Leslie Stillman. [*Id.*]. Defendant was then asked whether he talked to SA Payne and Agent Wilson about Amanda Woodcock, and admitted that he talked to the agents about "Johnny, who's known as the mechanic." [Tr. 61–62]. Defendant testified that he did not recall whether he talked to the agents about Cameron Lowery, and when asked about whether he talked to the agents about Elizabeth Patterson or Josh Lawson, he responded that he did not know

12

who they were. [Tr. 62]. Defendant also stated that he was unable to recall whether he provided phone numbers for some of the individuals that he talked about. [Tr. 62–63]. Defendant was asked whether he indicated to SA Payne that one of the reasons he wanted to talk was because he was scared of the Aryan Nation, to which Defendant responded that "they do some crazy stuff but I'm not too worried about what they do with me." [Tr. 63].

## III.    FACTUAL FINDINGS

Based upon the testimony at the hearing and the admitted exhibits, the Court makes the following findings of fact. Where the Court notes that there is conflicting testimony, the Court will discuss its factual findings and legal analysis of the conflicting testimony in the analysis portion of this Report and Recommendation.

On January 2, 2017, Detective Goins began surveillance of Defendant's vehicle after receiving information from a confidential source that Defendant was in possession of a safe containing narcotics and potentially a firearm, and would be driving a white Lexus which belonged to Defendant's attorney. Detective Goins witnessed an individual leave the surveilled residence in a white Lexus, fail to stop at a stop sign, and then had law enforcement conduct a traffic stop. Defendant had a parole violation at this time, and Detective Goins was instructed that Defendant's parole contract allowed him to be searched when stopped. The submitted report of the investigation lists the time of the offense as 12:45 p.m.

After searching Defendant's vehicle, law enforcement opened a safe which was located in the back seat, and found approximately 1 ounce of methamphetamine and a Taurus 9mm handgun. Defendant was then transported to the Campbell County Sheriff's Office. While Defendant asserts that he was interrogated by Detective Goins upon arrival to the Campbell County Sheriff's Office, the Court credits Detective Goins' testimony and finds that Defendant was not interrogated by

Detective Goins at this time. Defendant signed a waiver of his rights under *Miranda* at approximately 3:46 p.m., was interviewed by Agent Wilson and SA Payne, and subsequently confessed to owning the firearm and methamphetamine found within the vehicle.

## IV.    ANALYSIS

Defendant asserts that his confession to SA Payne and Agent Wilson should be suppressed because he was originally interrogated by Agent Goins, was not advised of his *Miranda* rights prior to the interrogation, and stated that he wished to speak to his attorney. Therefore, Defendant claims that his subsequent confession to SA Payne and Agent Wilson, after executing a waiver of his *Miranda* rights, was rendered inadmissible due to the prior *Miranda* violation and refusal of his request for counsel.

The Fifth Amendment provides that a defendant cannot "be compelled in any criminal case to be a witness against himself." *United States v. Protsman*, 74 F. App'x 529, 532 (6th Cir. 2003) (citing U.S. Const. amend. V). In *Miranda v. Arizona*, the Supreme Court upheld a suspect's constitutional right against compelled self-incrimination and established that no criminal suspect may be subjected to custodial interrogation without first being advised of the right to remain silent and the right to have counsel present. 384 U.S. 436, 478–79 (1966).

Specifically, *Miranda* mandates the following procedural safeguards: "prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444. The defendant, however, "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id.* Because the "warning of rights and their subsequent waiver are both 'prerequisites to the admissibility of any statement made by a defendant,' the failure of law-enforcement officers to

adequately warn a suspect in custody of his constitutional rights is fatal to the admission of any testimony induced by subsequent police interrogation." *United States v. Saylor*, 705 F. App'x 369, 372 (6th Cir. 2017) (quoting *Miranda*, 384 U.S. at 476). "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

Additionally, the Sixth Amendment guarantees the assistance of counsel to criminal defendants. U.S. Const. amend. VI. "This right is triggered 'at or after the time that judicial proceedings have been initiated . . . whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Alexander v. Smith*, 311 F. App'x 875, 887 (6th Cir. 2009) (quoting *Fellers v. United States*, 540 U.S. 519, 523 (2004)). "Once the Sixth Amendment has attached, the government may not 'deliberately elicit' incriminating statements from the defendant without the presence of his attorney." *Id.* (quoting *United States v. Henry*, 447 U.S. 264, 270 (1980)). As with the Fifth Amendment, "the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). The Sixth Amendment right to counsel may be waived even before the defendant is represented by counsel. *Id.* A suspect's valid waiver of his *Miranda* rights also generally amounts to a waiver of his Sixth Amendment right to counsel, "even though the *Miranda* rights purportedly have their source in the Fifth Amendment." *Montejo*, 556 U.S. at 786.

In determining whether a defendant was subject to custodial interrogation, "the 'ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Swanson*, 341 F.3d 524, 519 (6th Cir. 2003)

(quoting *United States v. Knox*, 839 F.2d 285, 291 (6th Cir. 1988) (cleaned up)).[2] In *Rhode Island v. Innis*, the Supreme Court defined "interrogation" for purposes of *Miranda* as not only "express questioning, but also . . . any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. 291, 301 (1980). An incriminating response includes "any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial." *Id.* at 301 n.5. Whether an interrogation has occurred is a fact-bound inquiry. *United States v. Thomas*, 381 F. App'x 495, 501–02 (6th Cir. 2010).

Here, Defendant was in custody beginning from when he was placed under arrest while outside of the Lexus vehicle. However, Defendant does not assert that he was interrogated during his arrest and subsequent search of the vehicle. The parties also do not dispute that Defendant was in custody when he was interviewed at the Campbell County Sheriff's Office, or that such an interview would constitute an interrogation. Therefore, the issue before the Court is whether Defendant was interrogated by Detective Goins at the Campbell County Sheriff's Office prior to his questioning by SA Payne and Agent Wilson.

"The Supreme Court's decisions in *Oregon v. Elstad*, 470 U.S. 298 (1985) and *Missouri v. Seibert*, 542 U.S. 600 (2004), address the admissibility of post-*Miranda* admissions relating to statements made by a defendant prior to receiving *Miranda* warnings." *See United States v. Ashmore*, 609 F. App'x 306, 315 (6th Cir. 2015). In *Elstad*, the Supreme Court held that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." 470 U.S. at 314. "When the pre-*Miranda* statement is coerced, however, 'the time that passes between

---

[2] *See United States v. Joiner*, 727 F. App'x 821, 827 (6th Cir. 2018) (using "cleaned up" parenthetical to remove internal quotations and alterations to the language of the cited opinion).

confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession.'" *Ashmore*, 609 F. App'x at 315 (quoting *Elstad*, 470 U.S. at 310). In *Seibert*, a majority of the Court held that when a police officer interrogates a defendant by eliciting pre-*Miranda* statements, reviewing the defendant's *Miranda* rights "midstream," and then asking similar questions, "all statements—pre- and post-*Miranda*—must be suppressed." *Ashmore*, 609 F. App'x at 315 (citing *Seibert*, 542 U.S. at 604 (plurality opinion); *id.* at 618 (Kennedy, J., concurring)). "The four-justice plurality and Justice Kennedy, however, applied different tests to determine whether a post-*Miranda* confession should be suppressed because of improper pre-*Miranda* questioning." *Ashmore*, 609 F. App'x at 315; *see also United States v. Pacheco–Lopez*, 531 F.3d 420, 427 n.11 (6th Cir. 2008) (declining to resolve the issue of whether the plurality or concurring approach in *Seibert* controls because the statement would be suppressed under either framework).

Ultimately, if Defendant was interrogated by Detective Goins, his subsequent confession to SA Payne and Agent Wilson would be inadmissible, as Defendant was not warned of his *Miranda* rights and interrogated after requesting his attorney. *See, e.g.*, *Miranda v. Arizona*, 384 U.S. 436, 496–97 (1966) (reversing *Westover v. United States*, and stating "here the FBI interrogation was conducted immediately following the state interrogation in the same police station—in the same compelling surroundings. Thus, in obtaining a confession from Westover the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation"). Without extensively reviewing the respective frameworks set forth in *Seibert*, the two alleged interrogations took place while Defendant was in custody after his arrest, at the same location, with a short period of time between the two interrogations, and both allegedly questioned Defendant regarding the methamphetamine and firearms found in the vehicle. Defendant asserts

17

that the alleged interview with Detective Goins occurred approximately an hour before he was interrogated by SA Payne and Agent Wilson. [Tr. 46].

However, the Court chooses to credit Detective Goins' testimony, as well as the supporting testimony of SA Payne, over that of Defendant, and finds that Detective Goins did not interrogate or question Defendant at the Campbell County Sheriff's Office. "When the parties disagree on an important fact, the court looks at the evidence as a whole and makes a credibility determination." *United States v. Flack*, No. 3:08-CR-108, 2009 WL 5031320, at *5 (E.D. Tenn. Dec. 11, 2009). The Court is given "wide latitude" in making credibility determinations. *United States v. Haynes*, 301 F.3d 669, 679 (6th Cir. 2002) (citing *Anderson v. Bessemer City, N.C.,* 470 U.S. 564, 573–75 (1985)). "In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic." *United States v. Massengill*, No. 1:14-CR-72-HSM-SKL, 2015 WL 13735424, at *3 (E.D. Tenn. Sept. 16, 2015) (citing *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005)), *report and recommendation adopted by*, 2016 WL 3264219 (E.D. Tenn. June 14, 2016).

First, the Court notes that Detective Goins testified that after Defendant stated that he wished to talk to someone above Detective Goins' "pay grade," he contacted Agent Wilson and Defendant was transported to the Campbell County Sheriff's Office. [Tr. 16]. Detective Goins stated that he did not transport Defendant to the jail, as he was driving an unmarked car at the time. [Tr. 18]. Defendant similarly testified that Detective Goins did not transport him to the Campbell County Sheriff's Office. [Tr. 44]. Further, Detective Goins conclusively stated that he did not take part in any interrogation or questioning of Defendant after he was taken to the Campbell County Sheriff's Office. [Tr. 16]. This testimony is supported by the report that Detective Goins prepared of his investigation of Defendant on January 2, 2017, which does not mention any

interrogation after Defendant was transported to the Campbell County Sheriff's Office other than that involving Agent Wilson. *See* [Exh. 1]. The report further notes that Agent Wilson advised that he read Defendant his *Miranda* rights, and Defendant agreed to give a statement. [*Id.*]. Additionally, SA Payne's testimony did not provide any indication that Defendant was previously interrogated by Detective Goins less than an hour before he interviewed Defendant.

Defendant points to Detective Goins' testimony that the stop of Defendant's vehicle took place in the early evening, as well as that Defendant arrived at the Campbell County Sheriff's Office approximately an hour and fifteen minutes from the time when Defendant's vehicle was stopped. [Tr. 17]. Defendant testified that he arrived at the Campbell County Sheriff's Office before noon [Tr. 44] and that his interview with SA Payne and Agent Wilson started at around 3:00 p.m., and went until approximately 5:30 or 6:00 p.m. [Tr. 60]. The Court notes that Defendant's signed waiver form states that he waived his *Miranda* rights at 3:46 p.m. [Exh. 2]. Additionally, Detective Goins' case report lists 12:45 p.m. as the time of the offense, with an evidence receipt listing 2:00 p.m. [Exh. 1]. Detective Goins testified on re-direct examination that 12:45 p.m. was the correct time of the offense. [Tr. 28].

Ultimately, while there are discrepancies regarding the time frame of the alleged interrogation, the Court finds that Detective Goins' report, prepared shortly after the arrest, corroborates his testimony that he did not question Defendant at the Campbell County Sheriff's Office. No summaries of any statement after this alleged questioning were detailed in the report, and the Government has not stated its intent to use any such statement. *See, e.g.*, *United States v. Massengill*, No. 1:14-CR-72-HSM-SKL, 2015 WL 13735424, at *3 (E.D. Tenn. Sept. 16, 2015) ("While there are slight inconsistencies in the various officers' testimonies over the course of both

19

hearings, these minor inconsistencies are entirely understandable given the lapse of time."), *report and recommendation adopted by*, 2016 WL 3264219 (E.D. Tenn. June 14, 2016).

Defendant claims that he was interviewed by Detective Goins in the same detective's office in which he was interrogated by SA Payne and Agent Wilson approximately an hour later. [Tr. 45]. Defendant also testified that he informed SA Payne and Agent Wilson that Agent Goins told him that "If you don't tell me that the gun was yours, I'm going to charge our [sic] attorneys that it was in the vehicle." [*Id.*]. However, SA Payne's testimony includes no mention of this statement, or any reference to prior questioning by Detective Goins in the same office where he questioned Defendant, despite the fact that SA Payne testified that he and Agent Wilson were in the detective's office before Defendant was brought in. [Tr. 34].

In claiming that this issue comes down to a credibility determination between Detective Goins and Defendant's testimony, Defendant points to Detective Goins' resignation in September of 2018, as well as hiring by the Campbell County Sheriff's Office less than two weeks before the evidentiary hearing. [Tr. 20]. However, the Court notes that Detective Goins testified that his actions were not against department policy, he did not face any adverse personnel actions, and that the Campbell County Sheriff's Office was aware of the conduct which led to his earlier resignation from the Eighth Judicial Task Force. [Tr. 22–28]. Further, there have been no formal complaints levied against Detective Goins regarding his handling of drugs or money. [Tr. 20]. *See, e.g.*, *United States v. Hedelsky*, No. 4:15-CR-13-TRM-SKL, 2016 WL 1714224, at *5 (E.D. Tenn. Apr. 6, 2016) ("While the officers may have an incentive to support their cases as argued by Defendant, there is no evidence that they have any history of fabricating evidence, no evidence they knew of Defendant prior to his arrest, and no evidence of any particular reason why they would falsify a written report and search warrant in July of 2015 and then commit perjury in this case as claimed

by Defendant."), *report and recommendation adopted by*, 2016 WL 1706147 (E.D. Tenn. Apr. 28, 2016).

"The Court also notes in a more general sense that [Defendant's] testimony at the suppression hearing was largely improbable for a number of reasons not directly related to the *Miranda* rights issue." *See United States v. Hernadez*, No. 3:13-CR-00132-CRS, 2014 WL 2980916, at *12 (W.D. Ky. July 1, 2014). First, Defendant testified that he did not have any keys on his possession upon being arrested, including any key used to open the safe found in the vehicle, and that Detective Goins instead obtained a key to open the safe from Randall Long. [Tr. 48–50]. Additionally, Defendant stated that he did not have a key to the recently-purchased safe, despite it containing his Social Security card and several car titles. [Tr. 53]. The Court also notes Defendant's bizarre, as well as dangerous, testimony that members of the Aryan Nation were going to shoot Detective Goins, until "he nodded and looked at them." [Tr. 58]. Lastly, Defendant testified that he was unaware of, or did not mention, several individuals who were listed in the summary of the interview between him and SA Payne and Agent Wilson. [Tr. 61–63]. The Court finds that these implausible, violent, and uncertain portions of Defendant's testimony further lessens his credibility.

Accordingly, the Court determines that Detective Goins' testimony was more credible and concludes that Defendant was not questioned or interrogated by Detective Goins after his arrival at the Campbell County Sheriff's Office. Therefore, the remaining question before the Court is whether Defendant voluntarily, knowingly and intelligently waived his *Miranda* rights.

A defendant may waive his Miranda rights (1) if the waiver is voluntary—i.e., "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and (2) if it was knowing and intelligent—i.e., "made with a full awareness both of the nature of the right being

abandoned and the consequences of the decision to abandon it." *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

The Government bears the burden to prove that a confession was voluntary by a preponderance of the evidence. *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999); *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir. 1992). While the Government bears the burden of proof to show that Defendant's waiver of his Miranda rights was voluntary, Defendant must first point to some evidence of improper police activity. *See United States v. Gatewood*, 230 F.3d 186, 193 (6th Cir. 2000) (admitting confession where defendant "failed to advance any evidence of coercive police activity").

However, the Court has found that Defendant was not interrogated prior to being questioned by SA Payne and Agent Wilson, and Defendant has not presented any additional arguments that his waiver was not voluntary. Here, SA Payne testified that he was informed that Defendant wished to speak to him, Defendant was read his *Miranda* rights, and he then signed a waiver of these rights. [Tr. 35]. Further, SA Payne testified that either he or Agent Wilson read Defendant's specific rights aloud, Defendant acknowledged that he understood these rights, and he and Agent Wilson then signed Defendant's waiver as witnesses. [Tr. 36]. The signed waiver form indicates that Defendant was acknowledging the waiver of his rights, as well as that "[n]o promises or threats" or "pressure or coercion" were used against him. [Exh. 2]. Lastly, Defendant acknowledged that he signed the *Miranda* waiver and then proceeded to provide a confession. [Tr. 46]. Defendant has failed to assert that he suffered from a "condition or deficiency that impaired his cognitive or volitional capacity," or "some element of police coercion"—other than the alleged questioning by Detective Goins. *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989).

Therefore, under the totality of the circumstances, the Government has established by a preponderance of evidence that Defendant made a knowingly and voluntary waiver of his *Miranda* rights before being questioned by SA Payne and Agent Wilson. Accordingly, the Court recommends that Defendant's Motion to Suppress [Doc. 1081] should be denied.

The Court also recommends that Defendant's first Motion to Suppress [Doc. 981] should be denied, as Defendant's basis for the motion appear to be conjecture and premature at this time. The Government has stated that it intends to call Detective Goins to testify at trial, and Detective Goins testified at the suppression hearing. Defendant fails to set forth any reason for suppressing the statement in his motion, other than speculating that Detective Goins will not testify.

## V. CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the Court finds that no violation of Defendant's rights occurred under *Miranda* or the Sixth Amendment violation occurred in this case, as the Court credits Detective Goins' testimony that he did not interrogate Defendant, and thus Defendant's waiver of his *Miranda* rights was freely

and voluntarily provided. Accordingly, the undersigned respectfully **RECOMMENDS** that Defendants' Motions to Suppress [**Docs. 981 & 1081**] be **DENIED**.[3]

Respectfully submitted,

Debra C. Poplin
United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

24